May it please the Court, Marie Yates for the appellant Mercato. Your Honor, if the District Court's summary judgment should be reversed because there is a genuine issue of material fact about when the statute of limitations began to run for Mercato's claims, arising from Defendant Deveney's bias in his actions as a member of the Historic Commission, where the Commission refused to approve Entrepreneur Mercato's project proposed for the Faubourg-Maroney District in New Orleans. The District Court, we believe, ruled erroneously on summary judgment that Mercato's Federal Claim accrued in April 2013, as this Court held in Lavalie, a Federal Claim accrues when the plaintiff knows or should have known that the defendant has injured him. And here Mercato's injury is that he was denied a fair proceeding before the Historic Commission because Defendant Deveney urged his fellow commissioners to reject Mercato's project when it turned out that Deveney was working hand-in-hand with the Faubourg-Maroney Improvement Association, which I call FAMIA, which was the opponent of Mercato's project. The statute of limitations couldn't have begun to run in April 2013, as the District Court held, because at that time Mercato didn't know and had no reason to know that there was a current, direct working relationship between Deveney and Deveney Communications on the one hand and the opponent Mercato on the other. Indeed, Deveney had written an email which was provided contemporaneously to Mercato August 8, 2012, in which Deveney had expressly denied that he had had any improper communications with FAMIA's board members or that Deveney's company, Deveney Communications, was in any way retained by FAMIA to help oppose Mercato's project. And it wasn't until February 2014, when Mercato finally got to depose Deveney, because the Louisiana State Court ordered Deveney to sit for a deposition, that Mercato learned for the first time that Costello, an officer and director in FAMIA, had helped Deveney write Deveney's letter to his fellow commissioners. Now the record site there is 1829 for the site that Costello was a FAMIA board member. That was not in our brief. Now the district court relied on the fact that Mercato had received in response to Mercato's public records request an email in April 2013, that's when Mercato received the email, and the email contained a draft of Deveney's letter to the commissioners and the email was sent to Costello. But that email did not solicit Costello's input on Deveney's letter. And it's important to remember that Costello is Deveney's life partner and they live in the Faubourg-Mariney district. So for all Mercato knows, Deveney could have been copying Costello just to keep him apprised of what was going on in their neighborhood. Well, let me ask you a question, though. I mean, wasn't all this pretty much public information? No, Your Honor. It was not public information that Deveney and Deveney Communications were working with FAMIA. No. I mean, what was public? What was public was that Costello was a board member and we knew that. We knew he was a board member. And that the other fellow was heading up the group that was opposing the project. No, no, no. That's what we didn't know. That's what we don't find out until — Well, they knew that that group was opposing the project. Yes, we knew that. We knew that. But remember, we later find out in discovery in this lawsuit from Deveney that, oh, he usually maintained a firewall between himself and Costello, and obviously he didn't maintain such a firewall in this case, because we find out in February 2014 and file suit a year later, we find out in February 2014 that Costello had, in fact, helped Deveney write Deveney's letter to his fellow commissioners urging the commissioners to vote against the project. Well, what were the conflicts of interest referred to in a letter from Makato's counsel in August? Your Honor — The August 7, 2012 letter. Exactly. It was in reference to conflicts of interest. What was that about? You're right. There is no doubt that we alleged through our counsel's letter that there was a conflict of interest. But the question is, on the record, did we have facts to know enough to file a lawsuit? In other words, we're bringing it to the attention of the commission and we're bringing it to attention of Deveney saying, hey, don't you want to recuse, because we think there's a conflict of interest, but then you have to look at the facts and decide, as a matter  And that's my — where I bring a policy argument to Your Honors and say, you don't want to make claims against public officials. But are you talking about the — under Federal law of accrual under 1983, or are you talking about a Louisiana accrual rule, when you say you should have known? Exactly. Exactly, Your Honor. You've got accrual, but you've also got the question of tolling of the statute of limitations. And under the Cruz decision that Judge Higginbotham wrote, the Federal court looks to the State law on tolling, and here the Louisiana tolling doctrine is contra non volentem. Well, in terms of — put aside tolling for the moment. In terms of the trigger of the limitations itself, I understand that you have two elements. You have the existence of an injury and causation, connection between the injury and the defendant. And that quote, really, from our case law, that says a plaintiff need not realize that a legal cause of action exists. A plaintiff need only the facts that would support a claim — would support a claim. Actual knowledge is not required. Circumstances would lead a reasonable person to conclude. And that's the measure. Well, exactly. That's the injury, right. But, Your Honor, the concealment goes back to August 2012, when Devaney writes his letter that's provided contemporaneously to our counsel, claiming that he doesn't have any improper communication with board members. That includes Costello. And — It's simple. It's really a simple denial by the suspect person. There's not concealment. Concealment implies some affirmative act to hide the ball, or in some fashion. Well — In other words, if they don't — if they don't confess outright, then — If I'm hearing, Your Honor, correctly, the affirmative act by Devaney, of course, is his writing of his August — I think it's August 12 letter to his fellow commissioners, which he signs as a commissioner and gives them 8 out of 10 guidelines on why the project doesn't satisfy. And that information comes into that letter, it turns out, we find out, after Costello gives his input. But we don't know that until we depose Devaney in February 2014, because prior to that time, of course, Devaney has denied having any improper or any communication with FAMIA board members, that would include Costello, about Mercado's project. It turns out that wasn't true. And, of course, we later learn in discovery in this lawsuit that at least eight employees of Devaney Communication — that's a company owned by Devaney — were working out of Devaney Communications offices to help FAMIA with the project. And that's even more information that would tell us that there was a current working — Well, but what he says — what he says in the letter of August 8, 2012, for the record, I have had no improper communication with any FAMIA board members. That appears to be a blatant untruth. That's true. I have no financial interest in this effort. That is probably not inaccurate, except in a very remote way. And my firm is in no way retained in the effort to oppose, which is probably hyper-technical, but not false, right? No, Your Honor. They weren't getting paid. We may not have been paid, but it's just like when a lawyer represents a client unpaid. They were definitely working for FAMIA. Well, I don't think those same rules apply to communications companies. Well, they were definitely working for FAMIA. And let me answer your question about the second point in that letter, the financial interest. It came out in discovery in this lawsuit that Devaney Communications used their work on this project to help FAMIA as a basis to try to get an award, a marketing award, which they used this project. They said, we helped FAMIA oppose Mercado's project. They used it. And then Devaney conceded in his deposition that, oh, yeah, well, when we get marketing awards, that helps us get business. I mean, that looks like a direct pecuniary interest by Devaney and Devaney Communications in assisting. When you say marketing award, you're talking about some honor? Right. An acknowledgment. All right. You don't mean money. No, I don't mean money. But Devaney conceded in his deposition that the company then uses those awards to go out and get business. So there is a direct financial link there in any event. So the district court also relied on the fact that Mercado knew about past dealings between FAMIA and Devaney Communications, where FAMIA was a paying client of Devaney  And so the fact that there were past relationships unrelated to Mercado, we would argue, doesn't show that Mercado knew or should have known that there was a direct, current working relationship between the two giving bias on the part of Devaney. And then, finally, the district court said, well, in April of 2013, Mercado was already in the running of the statute of limitations. There have to be facts that show that the defendant knew or should have known. But you say more than that. By the way, are your clients New Orleanians? Yes. Okay. Absolutely. So it says, our clients, we have learned that one or more FAMIA board members has engaged in regular improper communications with the commissioners of HDLC, including but not limited to Mr. Devaney. Right. Your Honor. And then you say, the current campaign against this project bears striking similarity to the PR campaign waged against the cold storage facility. Right. This reflects our suspicions based on past relationships between Well, let me ask a question. I mean, couldn't your client have filed a lawsuit at that time and put Mr. Devaney and Mr. Costello under deposition and gotten the information that it otherwise took them years to obtain through? Well, Your Honor, we filed a public records request four months after the city council rejected the project. Well, I understand that. But, I mean, wouldn't you have had a more powerful tool available to you in a lawsuit? Perhaps. But that goes to my policy argument that when do you want plaintiffs filing suits against public officials for bias? Don't you want them to actually have the facts in hand that show a reason to know there really was a bias? Well, I think we can assume, you know, I think the layman assumes that 50 percent of public officials everywhere are biased now, where public officials, except for judges, are held in low esteem. So we would like to argue that the rule of law should be that you really should have to have knowledge or reason to know that there was bias. And remember, all I need here is a fact question. We report out on summary judgment. How many commissioners are there on that? How many commissioners? Six or seven. And you're right. Devaney went to a wedding, and he said, I'm not going to vote, but here's my letter. You need to, you know, oppose this project. And he signs it as a commissioner for these reasons, dot, dot, dot. So I think, and furthermore, he's the commissioner from the Fulberg-Maroney District, Your Honor. And so there's a, I know there's evidence in the record with respect to city council that everybody on the city council defers to the council person from the district. So here is the member from the district. You've got a six-member board, and one of the members of the board is campaigning against you surreptitiously. Your Honor, aren't you into causation for the merits? And I'm talking about statute of limitations. Well, I know you're talking about the limitations, but I'm also talking about the quality and the nature of the merits themselves and the backdrop against which we have to look at the accrual, what you knew or should have known at what point. How have you progressed toward the right claim? Right. And we're arguing that we knew or should have known once we knew that Devaney had a current, direct working relationship with FEMIA to oppose our project. We think that's what gets us to federal accrual for the federal claim. And remember, we filed suit within one year of that deposition. And that's also what takes you to the tolling rule that Your Honor referred to under the contra-non doctrine because, of course, there's concealment here. You know, he writes the e-mail that Judge Jones quoted, and that's provided to us. And you run into the problem that if you let the statute of limitations accrue too soon, then the public official stonewalls, the public records request was exactly what happened here. We had to file a mandamus in Louisiana State Court to obtain those documents, and even when he responded, he didn't respond fully, as we know from the Louisiana State Court order from last month that we've asked the Court to take judicial notice of, and I wanted to cite the N. Ray Greenhill's case, which is a case from this Court, where this Court took judicial notice of a State court order and a related proceeding on an appeal from a summary judgment that's 741 Fed 3rd 651 at note 5. And as the Court wrote in that case, the State court order is indisputable, so there's not any prejudice to the opposing side. And here, our opponents begged it by arguing to this Court, oh, no court has held us who have violated the public records law. And so we believe that the Court should take judicial notice of that order. And I'll note that the Ninth Circuit has agreed with this Court's rule, 681 Fed 3rd 978 in Snow v. McDaniel, that judicial notice is an exception to the normal principle that this Court would only look at what was before the district court. So in light of that State court order, we think there's a fact question on tolling for a jury, but even before the State court order, we feel like we have enough evidence of concealment between his August 8, 2012, e-mail that Judge Jones read and his failure to respond promptly, and then his final failure to fully respond to the public records request to show that there's a fact issue on whether the statute of limitations should be tolled. And we, of course, also argue the statute of limitations should be tolled or there's a fact issue to preclude summary judgment on whether it should be tolled based on the discovery rule. So for all these reasons, we ask this Court to reverse the district court's summary judgment and give us a chance to go to a jury on the fact question. Thank you. Okay. Thank you. Mr. Berlander? Any relationship to an Astros pitcher? Not close enough that I would get free tickets, Your Honor, but I'm sure distantly. May it please the Court. Judge Higginbotham, you touched on the question of the standards for accrual versus tolling, and I think that's an important distinction that the appellants have been eliding over. It's clear in this Court's precedent that the question of when a 1983 action accrues is based on Federal law. And that standard is, and this is quoted in Judge Jones' opinion in the P.R. Trotsky 2 case, quoting P.R. Trotsky 1, under Federal law, the limitations period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured. The appellants are correct that the question of equitable tolling is pursued by reference to State law, which is where the Chevron case and its precedent comes in. And the significance of this is burden of proof. We have the initial burden to show that there's no material issue of fact that the prescriptive period has run and has begun. And the appellants have to show, have the burden then to show it would shift to them to show that there's a material issue on equitable tolling. And the wording of that standard, what that means, what a reasonable basis is to proceed, it depends on which case you look at, but the wording is consistent. In the Louisiana State law, it says the Chevron case cites to Jordan, which cites to other Louisiana Supreme Court cases. Prescription starts when plaintiff knew or should have known that there was a reasonable possibility that his problem may have been caused by the defendant's acts. Teague may have been caused by that the condition might be related to the defendant's acts. Griffin, another Louisiana Supreme Court case. Prescription does not run as long as it was reasonable for the victim not to recognize that the condition may be related to the treatment. So you're basically saying that they should have known your client and his best friend were scum, and therefore they should have filed suit early. No, ma'am. First of all, as Your Honor is aware, we also filed a motion for summary judgment on the merits of this claim and take strong issue with the fact that there is a claim at all. Well, that's a whole other matter. Yes, ma'am, it is. But I take issue with the Court's wording on my clients and their actions. I would note that the e-mail to which Your Honor alluded earlier, the August 8th e-mail, which was in response to Mr. Middleburg's letter on behalf of Mercado, the appellant, what Mr. Devaney said was that he had no improper communication with FMIA board members. That is not a lie. That's true. We continue to maintain that he had no improper communication. Of course he had communication with FMIA board members, as they well knew. He was living with and working with an FMIA board member. He lived in the marinee. This was a neighborhood association. He's on the Historic District Landmarks Commission. It's not at all surprising that he would have communication. He said something about a Chinese wall. Did he claim a Chinese wall? Not to my knowledge and not in that letter, Your Honor. Well, what's improper? I mean, okay, so if he had said no communications at all, that would have been not true. I think that would have been true. But when he's saying no improper communications, then he's saying he has communications. But, A, they weren't retained, and, B, there's no financial interest, right? Correct. And that is unrebutted also. And I would add, speaking of that, that the evidence here upon which we are relying is documentary evidence, and there is no material issue of fact about it. It's the record. The question is a matter of law, which is, before Your Honor's de novo, is the evidence that we have put forward sufficient to start the prescriptive clock? And assuming for the sake of this— He says there was some stonewalling in connection with the public records request. Well, yes, Your Honor. And, again, we take issue with that, but that is we—this was run through the city of New Orleans. The request, as the lawsuit in the public records suit says, was directed to the city of New Orleans. The questions to Mr. Devaney came later from the city attorney's office on what he should gather. They initially produced documents in February of 2013. Mr. Devaney gathered what he understood them to be asking for, 265 pages of material, which were produced in April of 2013. That's the material to which the district judge alluded. And then there was subsequent activity. There were long gaps of time where the Mercado did nothing at all, and that's why the case sat around so long. For over a year, they just—they did nothing in that case. But in November of 2013, Mr. Devaney was asked by the state court judge to go back and look again, and he did and found 13 more pages, which Mr. Cummings acknowledged he received and saw in November of 2013, also well more than one year before this suit was filed. So we take issue with the idea of stonewalling, but whether there was or there wasn't, we know what they had beyond dispute. We know what they were given in April of 2013 and November of 2013. We know because they told us. And Your Honors have already alluded to the Middleburg letter. He doesn't say there used to be or there was or there was some time in the past conflict of interest. He says the HGLC members have not recused themselves despite obvious conflicts of interest. I've learned that FMIA board members, in opposition to this project, have engaged in constant improper communication with Commissioners of the HGLC, including but not limited to Mr. Devaney. That's not in the past. So assuming for the sake of argument that these communications were somehow improper, they knew about it. They said so in writing. They knew that Mr. Costello was his boyfriend, wife, partner. Let me ask you a question about what the rules of the Commission are. Do you have other rules in the state law that prohibit a Commissioner in a zoning type matter not to have next party discussions with constituents, et cetera? I say no, Your Honor, and the city and state. Think of a congressman. They've got people pulling at their sleeve at every turn with all kinds of special interests. That's just the way it is. It's just politics. But that Commission that's being set up is like some insulated judicial body. Yes, sir. That's what they're arguing. He didn't vote. I mean, what you have is, in the facts that I understand them, is that the Commission denied an application, denied the appropriateness certificate that was necessary to conduct the building. Having done that, in doing that, one of its members did not, in fact, vote, although he was opposed to it and was urging his other members to not do so. Now, where is the underlying substantive? Is there any violation of Louisiana law in that? Start with that. I say not, Your Honor, and the state Board of Ethics. What are the rules? Instead of getting to the conclusion, what are the rules, if any, that pertain to that? I'm sorry, Your Honor? What are the rules, if any, that regulate the participation of a member of the Commission? Are they supposed to abstain if they have some—I'm not sure what this— If they have an actual conflict of interest, that is that, you know, for example, let's say he owned a property adjacent to this property. Was there an allegation that he was an economic beneficiary of this, or he just didn't want to high-rise in that area? He had no direct economic benefit. That's why they're trying to say, oh, well— It was a husband and his wife. I mean, just to—I mean, there's no allegation that this, for me, a group, it had property. In other words, so it's not a community property type right. And so there's not a—there's a presumption the people who are living together are going to communicate with each other, as you say, but to what extent does that presumption limit what Devaney ought to be doing? In other words, that's not just any member of the body politic, right? That's somebody you have to get along with. Well, yes, ma'am, I do see what you mean. But the fact that Mr. Costello was a member of the FMIA, a board member of the FMIA, that's a—what the FMIA is was a community organization to try to protect the integrity of the marity. And those are constituents of Mr. Devaney's— Were those people appointed to this board? You said Devaney was—his term is up at some point, right? He is still on the HDLC. I know that because he dealt with the statue removal issue not too long ago. Who appoints the commission, the mayor? I believe that's correct, and it's a voluntary—it's volunteer. You don't get paid. Yes. But even if there were something wrong with his communicating with Mr. Costello, which we dispute, they knew it. They talked about that there was improper communication going on with board members. They talked about in this letter that Costello is a treasurer, a former president, and CFO. They knew that he had gotten a copy of the draft and that the final letter changed from his getting the copy of the draft to the next day. How did they know that? Because they received it in April 2013 when they got the 265-page production of the emails and other documents that Devaney found initially. Well, what do you say to Ms. Yates's argument that, you know, why should anyone jump the gun when dealing with public officials? Well, it's much like what the Supreme Court talked about in the Kubrick case, which underlies lavalie and its progeny, that if you set the level of knowledge, they want the standard to be some kind of absolute certainty. And if you set that there, then it would eviscerate, there would be no prescription statute of limitations at all. That's not the standard. For example, if I get rear-ended, I'm stopped at a stoplight and I get rear-ended, I don't know for a certainty that the person who hit me is at fault. I know I've been injured, but I don't know they're at fault. Maybe the brakes failed. And, in fact, there's a case, Cartwright out of Louisiana, that's cited in the Chevron case where that's what happened. And the other driver said, you — my brakes failed. The plaintiff sued the other driver, didn't sue the brake manufacturer, lost with the other driver because the brakes had failed, and then tried to sue the brake manufacturer. The court said, too late. You were on reasonable notice. You had reason to know that there was a possible claim here, and the clock starts. And if there were any doubt that that's enough to start a clock here, they actually filed a lawsuit making allegations. And in State court, just like in Federal court, when you go into court and make allegations, you're making them on good faith that you believe them to be true, as Mr. Cummings confirmed when he was deposed. But, I mean, that's precisely — it's Rule 11, and it's also some level of deference to people in an executive authority that they're not deliberately concealing, misleading, and so on. And by the same token, because they have — even though it's a burden to be in public service, it's also a privilege and entails certain responsibilities, one of which is candor. And if Mr. Devaney had said in response to that letter, well, you're right, I'm recused, because I am — most of my employees are working against this project, I mean, that would have been a ground for recusal, don't you think? No, I don't agree, because — The fact that they're volunteers. They were volunteering to work on this, and that's — They were all doing it only on their lunch hour and at night and in the mornings. I don't think that's in the record or not, but it's clear that it was volunteer. And the allusion to the application for an award referencing this, that's for volunteer activity. That's what they were talking about. That is Devaney Communications. But even if there were something wrong with those things, as they say, which we dispute, they knew it because they said so, and they filed a lawsuit to say so. In the State Court, at paragraphs 7 and 8, this is in Record 150, upon information and belief, Commissioner Devaney improperly sought to have the HDLC deny Mercado's application for a certificate despite having a conflict of interest that required his recusal. Further, on information and belief, Commissioner Devaney's improper participation in the HDLC's review of Mercado's application for a certificate prevented Mercado from receiving a fair and impartial review of its application. This is not just — this is a lawsuit. They filed the lawsuit, and they said that. And he said, yes, I hired Mr. Senga, said he'd file that. Yes, I believe that to be true at the time it was filed.  We know because he did. Whatever the wording of the standard here is, and as I say, the reason to suspect may have — you can look at different opinions and find different wording. Certainly information and belief is sufficient, as many petitions of factual allegations are filed. And here there is no question that they had all the information that they needed, and we know that from their own words in writing repeatedly. So there's no material issue of fact. There's no credibility call. It's in writing, and it's in front of you, just as it was in front of Judge Vance, to make the call on the law. All right. Thank you. Judge Graves, the stonewall — I'm sorry, the firewall testimony is the record at page 1167. That's where Devaney, in a July 2016 deposition in this case, testified that, well, I usually keep a firewall between me and Costello with respect to what I do before the commission. We know he didn't keep that kind of firewall here. In the Chevron case, Chevron was investigating. You'll remember which of several defendants might have been the cause, and the court held, well, the statute is told because they didn't know yet which defendant they were investigating. We would argue that's what we were doing in the public records request that we filed in January 2013, four months after the city council denied the project. He didn't respond in January 2013. We had to file a mandamus. He does an incomplete response in April 2013, another incomplete response in November 2013. Finally, the state court compels a deposition, February 2014. We do a forensic search pursuant to the state court order, and we find more public records that he didn't turn over, including this e-mail that we just got pursuant to the Louisiana state court order last month. So we believe this shows that the public official — you know, counsel talks about what should the standard be for a public official. Certainly the public official isn't permitted to misstate. I don't want to use the word lie, but surely he's not permitted to misstate, to write a letter to his fellow commissioners that's provided to our counsel that says, I didn't have any improper communication with the board member. My company, Devaney Communications, is in no way retained, and I get Judge Jones's point about they weren't being paid, but eight employees, they're using Devaney Communications' conference rooms and computers and credit cards. They're designing the logos and the, you know, the sign for the yards. I mean, they're running the FAMIA campaign out of Devaney Communications' offices. And it's true that he has a right to have an interest. He lives in the Faubourg-Mariney District. I get that. But what he doesn't have the right to do as a public official is to collaborate with the opponent against us. And I don't think it should matter whether he actually voted. He might as well have voted. He writes this detailed letter, signs it as a commissioner, and says, I think you guys should all vote against this because of all these detailed reasons. So, and it's true that we were provided an e-mail that where the draft letter was copied to Costello. But as I said in opening, Devaney is not saying in that e-mail, please, Costello, tell me what you think I should say, which is what really happened. In fact, that's the e-mail. I'm stepping down. I'm not going to vote on this matter because I have strong feelings about it, and I know a lot about this personally, and I'm going to oppose it and oppose it. Right, but if the background behind the scenes, what we don't know is that his company, which has done past work for FAMIA, that we know, is actually running the FAMIA opposition out of their offices, eight employees, and that's what we don't know? And so, and we get the public records request so that we can find out. And look, Your Honors, what's the e-mail that he didn't turn over on the public records request? Places of the opposition. Where's the money? Isn't that interesting? They're using Devaney Communications credit cards for the money. They're using Devaney Communications credit cards to pay the expenses. And they say, oh, we'll get that money back from FAMIA. And Judge Jones, that still means they're not retained, I guess, huh? They're using Devaney Communications credit cards to pay for the campaign. They're not retained. They're contributing. Well, you know, at what point is Devaney's letter so misleading and such a— I understand that he might have an economic stake in it, but his opposition is simply that the aesthetics and this community just doesn't need a high-rise. It should be retained. The whole New Orleans will look in the way, and he's passionate about that. He said, look, I'm on the commission, and I'm not going to vote on it, but I'm darn sure going to oppose it. And I'm going to list my friends to help me, and so on and so forth. And might there be a fact question on that's the way it really played out? But, Your Honor, there is a direct economic pecuniary benefit. We laid that out when we deposed Devaney in January—I'm sorry, in July of 2016. He has done past work for Famia. That's where they opposed the coal storage facility, right? Then he uses—his company uses their work for Famia on this campaign to oppose Mercado as a basis to get marketing awards to judges. I mean, do people ever recuse from making decisions on this board? Well, you hope so, Your Honor. You hope when— Well, I know that, but, I mean, the whole point is it's aesthetic and architectural, and you have a certain person on the board. You know what their views are. Right. And that's what's— And he's certainly entitled to his views, but he's not entitled to run the opponent's campaign and not tell the fellow commissioners and mislead us as to whether he's doing that. There ought to be a fact question here for a jury. That's all we're saying. Thank you, Your Honor. Thank you. We'll be in recess until 9 o'clock tomorrow morning. Thank you.